[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO STRIKE
The plaintiff in this case has filed a twenty-eight count complaint. A motion to strike has been filed as to all counts. The court will discuss the allegations of each count more specifically but generally speaking this case arises out of a claim made against a day care provider. The parents and the child claimed to have suffered injury and damages as a result the alleged substandard and neglectful care provided by the defendant to the child.
The standard to be used in deciding a motion to strike is well-known. The pleadings of the non-moving party, here the complaint, must be given that reading which is most favorable. Amodio v. Cunningham, 182 Conn. 80,82 (1980). The defendant's claim as to each count is that they are legally insufficient.
The defendant moves to strike counts one, two and three which are based on breach of contract. As to each count the defendant quotes what it states is basic contract law to the effect that a breach of contract action requires four elements (1) formation of an agreement (2) performance by one party (3) breach of the agreement by the other party and (4) damages. Posner v. Minnesota Mining Mfg. Co., 713 F. Sup. 562-63 (EDNY, 1989). The defendant claims that although the plaintiff alleges that the defendant failed to provide an atmosphere of love and caring for their daughter, pursuant to their agreement, they "fail to allege how the plaintiffs were damaged by this breach." This is the only basis for the motion to strike as to the contract claims.
As the plaintiffs note in the request for damages at the very end of the complaint, and referencing all counts, the plaintiffs do say that they request "return of the fee paid for services not performed" and the second requested relief is "damages for injury sustained."
Giving the pleadings their most favorable reading the claim for return of fees paid can be considered as reflecting the measure of damages being sought by the plaintiff in the contract counts. The defendant has not addressed the propriety of such a measure of damages for such a claim and by their representations in this regard The plaintiffs are now limited to this measure of damages on their contract claim.
The second request for damages in the complaint — "damages for injuries sustained" is too vague and conclusory to indicate what damages the plaintiffs are asking for in their contract counts in addition to or beyond the request for return of fees paid. That is, "the ordinary rule is that mere breach of a contract does not warrant recovery of either punitive or mental distress damages." Dobbs, Law of Remedies, Vol. I, § 6.12, p. 251; Vol. II, § 12.5, p. 187, et seq. But Section 353 CT Page 11489 of the Restatement (Second) Contracts does provide such damages are allowed where the breach "also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was particularly likely to occur." cf. Bertozzi v. McCarthy, 164 Conn. 463,469 (1973). Nothing in the language of the complaint or the prayer for relief, however, would permit such a claim which should be specially alleged if it is made pursuant to a contract claim. Therefore, the motion to strike is only denied because the complaint can be construed as making a damage claim in contract for return of fees paid and not on the basis that the claim for "damages for injuries sustained" adds anything to the case.
 II
In counts four, five and six, the basis of the claim is that "the defendant failed and neglected to provide proper supervision for Hannah," paragraph 24 of these three counts. Count four is brought on behalf of the child and it alleges that the distress caused resulted in physical and emotional developmental harm to the child. Counts five and six are brought by the respective parents and each of these counts allege the actions of the defendant as regards the child and the resulting harm to the child caused each defendant depression, emotional distress, feelings of guilt, increased burden of child rearing and loss of consortium. As to all these counts, the defendant first argues that in a negligent supervision case a plaintiff must "ordinarily" plead injury by the negligence of the defendant in failure to properly supervise an employee or agent as to whom the defendant had a duty to supervise and whose actions, from what the defendant knew or should have known, would cause the injury claimed. Brunelle v. Reuters Analysis, Inc., Judicial District of Hartford/New Britain, Docket No. 566808 (1998); Surowiec v. SecurityForces, Inc., Judicial District of Hartford/New Britain, Docket No. 547875 (1995). Certainly, "negligent supervision," as described by the defendant, is a recognized tort and there is no allegation here that the defendant improperly supervised an employee caring for the child. But although the plaintiff uses those vague words what the plaintiff alleges in the fourth count really is negligence on the part of the defendant herself in the way she supervised, in the sense of how she cared for, this particular child. As regards the claim of the child Hannah in count four, the court will not strike that count; all the plaintiff is making is a simple negligence claim saying that the factual allegations of the first 21 paragraphs set forth how she alleges the child was negligently supervised or cared for by the defendant and this caused the child harm.
The fifth and sixth counts are attacked on a separate basis. There, the parents say the negligent care given by the defendant to their child caused them, the parents, to have suffered harm and injury in the nature CT Page 11490 of "depression, emotional distress, feelings of guilt . . .
The defendant argues that these two counts state a claim for bystander emotional distress and the requirements of Clohessy v. Bachelor,237 Conn. 31 (1996) have not been met — particularly that requirement that their be contemporaneous sensory perception of the event or conduct causing the injury. Id., p. 52.
The plaintiff counters by citing a trial court case decided beforeClohessy, John Doe. et al v. Cuomo, 43 Conn. Sup. 222, 225 (1994). That case refused to strike a negligent infliction of emotional distress claim by parents of a child who was sexually assaulted by an individual to whom the parents entrusted the child for her care. That case is not directly on point in the sense that the conduct causing the injury was intentional assault which raises different concerns than those addressed in Clohessy
which discussed the limits of liability on bystanders recovery where negligent activity caused the injury — of which more later. But in any event, the plaintiffs broadly argues that: "The essence of the complaint is that the tortfeasor acted outside the presence of the prospective gaze of the parents violating the trust reposed in her . . . had the parents been present the neglect would not have occurred.
The latter argument is conclusory and the consideration of whether, for example, a parents presence would have prevented a child's injury has nothing to do with the policy reasons discussed by Clohessy for the contemporaneous sensory perception requirement. The California courts have concluded under Dillon and Thing that a bystander emotional distress claim would lie when the injury was caused by medical malpractice. Ochoav. Superior Court, 703 P.2d 1 (1985). This court reached the same result in Estate of Frederick Davis v. Yale New Haven Hospital. et al, Judicial District of New London, Docket No. 548382 (2000). To reach this result,Ochoa had to decide that the injury producing event need not be a sudden occurrence but could result from a course of conduct. 771 P.2d, at p. 7.Thing v. LaChusa, 771 P.2d 714 (1989) accepted this result whichClohessy incorporated in its I contemporaneous sensory perception requirement. But why should the contemporaneous sensory perception requirement be applied to malpractice situations -as it is in Ochoa -and not to the day care situation? Both of these scenarios involve a course of conduct resulting in injury and in Ochoa, the mother was present while her child was not being medically treated, complained but could do nothing about the situation.
In fact, the California Supreme Court appears to have rejected by indirection, the plaintiff's present argument and the position taken inDoe v. Cuomo, supra, in a case decided the same year as Thing v.LaChusa, but before that case. The case is Marlene F., et al v. AffihatedCT Page 11491Psychiatric Medical Clinic, 770 P.2d 278 (Cal., 1989). There, the mothers of minor children brought them to a clinic to receive "counseling for family emotional problems." The mothers then discovered the children had been sexually molested. Because of this despicable activity, the mothers brought suit against the operators of the clinic for negligent infliction of emotional distress — they alleged the molestation caused mental suffering and disruption of family relationships. The defendants referred to Thing's precursor Dillon v. Legg, 441 P.2d 912 (1978). The court did not apply the reasoning of that case, however, because:
 [2] In the present case, the complaint explicitly and expressly alleged that the mothers of Robert and Phillip, as well as the children, were patients of the therapist; specifically, that he "undertook to treat both [mother and son] for their intra-family difficulties by providing psychotherapy to both. . . ." It further alleged that the therapist "was aware of the relationship between the patients" and that he "believed that one of the problems in the family arose from the relationship between [mother and son]." In other words, the counseling was not directed simply at each mother and son as individuals, but to both in the context of the family relationship. And the complaint alleged that the discovery by the mothers of the therapist's sexual misconduct caused them serious emotional distress, further disrupting that family relationship." Id., p. 282.
This observation was fundamental to the court's position because in the case before it and in an earlier case, Molien v. Kaiser FoundationHospital, 616 P.2d 813. The Marlene F. court said, referring to Molien:
 "Our decision did not, however, purport to create a cause of action for the negligent infliction of emotional distress based solely upon the foreseeability that serious emotional distress might result. It is plainly foreseeable, for example, that close family members of a patient would suffer severe emotional distress if told the patient had been diagnosed as suffering from a terminal illness, but without more, the patient's physician would not be liable for that distress whether or not the diagnosis was erroneous. . . . Damages for severe emotional distress, rather, are recoverable in a negligence action when they result from the breach of a duty owed the plaintiff that is assumed by the defendant or CT Page 11492 imposed on the defendant as a matter of law, or that arises out of a relationship between the two." Id., p. 282.
What the court was thus saying, was that absent the negligent breach of duty owed by the care-giver, as care-giver, to the plaintiff who is not the injured party, Dillon v. Legg and its requirements such as contemporaneous sensory perception would apply.
As stated in Modern Tort Law, Lee and Lindhal, Vol. 3, § 32.06( ):
 "Historically, courts have accorded separate treatment to claims for emotional injury resulting from negligent conduct, depending upon whether the emotional injury resulted from the plaintiff's apprehension of harm to himself or herself or from apprehension of harm to another."
 Marlene F. and Molien permitted a negligent infliction of emotional distress action because of the therapeutic or care giving relationship between the tortfeasor and the very plaintiff making the claim, in a situation where there was also another family member injured by the acts of the tortfeasor. Thus it could be said that emotional injury resulted from apprehension of harm to the plaintiff. In the Dillon, Thing andClohessy line of cases — like here — the apprehension of harm was to another, the person's child.
The court concludes that Clohessy should apply; admittedly there was no contemporaneous sensory perception of the event or conduct causing the injury — the plaintiff's concede the injury to the child occurred outside their presence. The fifth and sixth counts are stricken.[1]
 III
The motion to strike is directed at counts seven, eight and nine. Count seven is brought by the child; the parents have brought counts eight and nine. The defendant expressed confusion as to whether counts seven and eight allege intentional infliction of emotional distress or intentional breach of contract. From the plaintiffs' response, the court gathers that emotional distress is the basis of the cause of action set forth in these counts. Intentional breach of contract appears to be not so much a separate cause of action as a factor in determining whether punitive damages are recoverable in an ordinary breach of contract action. SeeI.F. Pace and Sons, Inc. v. Travelers Indemnity Co., 9 Conn. App. 30, 46
et seq. (1986). In any event, there is already a breach of contract claim and a request for punitive damages. The court will therefore treat the CT Page 11493 claims in these counts as claims for intentional infliction of emotional distress.
The court will first discuss count seven. For a claim of intentional infliction of emotional distress to lie, the conduct must be extreme and outrageous. The Restatement (Second) Torts at § 46, comment (d) states "liability has been found for this tort only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of facts to an average member of the community would arouse his (sic) resentment against the actor, and lead him (sic) to exclaim, `outrageous'". Our courts seem to accept this characterization. See Bell v. Board of Education, 55 Conn. App. 400, 409
(1999). However, as Bell notes at page 409, quoting from a federal case, "whether the defendant's conduct and the plaintiff's resulting distress are sufficient to satisfy . . . these elements (of the tort) is a question, in the first instance for the (court). Only where reasonable minds can differ does it become a matter for the jury." Reed v. SigrodeCorp., 652 F. Sup. 129, 137 (D. Conn. 1986). This is also the Restatement position, see § 46 comment (h), also see Pittman v. Cityof Oakland, 243 Cal.Rptr. 306, 311 (1988). The vehicle in our state to make such a preliminary determination is a motion to strike directed against the complaint. Other jurisdictions also recognize the ability of courts to dismiss complaints in this type of case where the language of the complaint does not allege sufficient facts to support a claim of outrageous behavior. See Pittman v. City of Oakland, supra; Fudge v.Penthouse Intern Ltd., 840 F.2d 1012, 1021 (1988); Frankel v. Warwick Hotel, 881 F. Sup. 183, 187 (ED. Pa, 1995); Whitehead v. Am Intern.Inc., 860 F. Sup. 1280, 1290 (N.D. Ill., 1994); also see Krieran v. Izzo, 174 N.E.2d 157 (III., 1961); see generally, Lucuk v. Cook,21 Conn.L.Rptr. 157 (1998).
The problem with policing this tort so that every abuse or indignity in modern life does not become the subject of a tort action is that the Restatement definition of "outrageous" is somewhat subjective. See criticism in article by Professor Guelber at 82 Columbia Law Review 42 (1982). On the other hand, the policing task must be and has been done by several courts and certain general principles have been developed to help define what should be meant by "outrageous" conduct, cf. Lucuk v. Cook, supra.
What are the factual allegations in count seven of the complaint to support the claim? Paragraphs 7, 11 and 13 indicate that when the events that are the subject of this suit took place, the child was between two months and five and one-half months old, paragraph 11 indicates the child CT Page 11494 was left with the defendant as day care provider on all days that the parents did not work. Paragraphs 13-15 indicate state workers came to the defendant's home to investigate the care the defendant was providingthe child. Paragraph 18 indicates the complainant was a parent of a child formerly enrolled with the defendant as a day care provider. Paragraph 21 states: "Hannah had been allowed to cry for long periods of time without any intervention by the defendant" and this constituted a breach of duty to care and nurture the child, paragraph 23, and as a result, the child suffered "great emotional distress," paragraph 25.
The court must take these allegations as established for the purposes of this motion but even with that, the allegation that this child had been left to cry for long periods without intervention by her day care provider cannot, in Restatement terms, be defined as conduct "so outrageous in character, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community," comment (d) of § 46. It is true that the plaintiff child was an infant of only a few months. One case has said that:
 "The extreme and outrageous character of the conduct may arise from the position of the actor or a relationship to the distressed party . . . for example, it may occur through the abuse of a relationship which puts the defendant in a position of actual or apparent authority over a plaintiff or gives a defendant power to affect a plaintiff's interest." Margarita v. Diamond Mortgage Corp., 406 N.W.2d 268, 272 (Mich., 1987). (Continuing and vicious harassment of family by mortgage creditor over a period of two years.)
But here, the child was left with the defendant for only a three and one-half month period. This was not a situation where the defendant had knowledge of any special emotional or physical problem or disease of the child and knowingly aggravated the condition or failed to take recommended or agreed upon steps to deal with the condition. The parents claim to have noticed behavioral problems, paragraph 12, but this is not a situation where there is any suggestions they confronted the defendant with these problems and that the defendant then misrepresented what she was doing or failing to do with regards to care of the child. If the bare bones allegations of this complaint are accepted as permitting a claim for emotional infliction of emotional distress on the basis of outrageous conduct a whole floodgate of litigation would be opened permitting actions by children against teachers or any one entrusted with their care. CT Page 11495
Such a remedy is peculiarly unnecessary in a case such as this where the court has not stricken the negligence count and thus a claim can be pursued that such negligent activity caused serious emotional and physical problems for the child. The seventh count is stricken.
The court will now discuss the intentional infliction of emotional distress claim brought by the father, count eight and the mother count nine. These counts must be stricken for two reasons. Relying on the just concluded discussion, the court also concludes that the allegations of each count are legally insufficient because the conduct alleged, although understandably distressing, is not extreme and outrageous.
But there may be an added reason for striking these counts in the court's opinion which is based on the discussion in comment (e) of § 46 of Restatement (Second) Torts. These counts appear to claim that the defendant intentionally breached her duty of care to the child by leaving the child crying for long periods of time. There is, of course, no allegation that the parents witnessed these periods of intentional Fack of attention to their child. The parents learned of this apparently by being so informed by a state agency which investigated the defendant. See paragraphs 13, 20 and 21.
Comment (e) of the Restatement § 46 notes as regards this tort that: "The cases thus far decided, however, have limited such liability to plaintiffs who were present at the time (of the extreme and outrageous conduct), as distinguished from those who may discover later what has occurred." The Restatement argues that this limitation is justified by practical necessity and seems to base its reasoning in this regard on the need to ensure the genuineness of the claim of emotional distress. But the Restatement adds the caveat that it intended "to leave open the possibility of situations in which presence at the time may not be required." Certainly, the genuineness of the parents' distress cannot be doubted here or in cases of this type.
Since Clohessy v. Bachelor, 237 Conn. 31 (1996) by its terms discuss limitations on bystander recovery where the tortfeasor acts negligently, the question becomes to what extent those limitations should apply where the tortfeasor acts intentionally. Here, as noted, we are dealing with the second prong or requirement of Clohessy that there be contemporaneous sensory perception of the injury.
This court, at least, concludes that the concerns behind the Clohessy
second prong requirement dictate that that same limitation, in many instances, should apply to bar claims against intentional actors. Genuineness of the claim is not the only issue; other concerns raised by the Clohessy court apply here too, although that court was admittedly CT Page 11496 dealing with negligent conduct. If the contemporaneous sensory perception requirement were not applied to intentional actions there also would be a flood of cases, sympathetic juries would have little in the way of guidelines, serious proof problems as to damages would arise and the tortfeasor could be exposed to an endless number of claims, cf Clohessy
at pp. 50-51. As comment (e) of § 46 suggests this is a developing area of the law. And it could be argued that with certain international torts a close relative or parent should be allowed recovery even though there is no contemporaneous sensory perception of the injury — this might apply to vicious personal assaults or situations where the intentional tortfeasor knew or had reason to know of a special vulnerability of the parent or relative that would make the likelihood of distress as a result of injury to a loved one obvious. None of these factors are operative here so that even if the actions or failures to act of the defendant are construed as intentional, the court does not believe the parents have a right to bring what is in effect an action because of apprehension of harm to the child since there was no contemporaneous observance of the injury producing conduct. It is not even alleged that the defendant would know or have reason to know that her actions or failures to act were likely to produce circumstances that would cause the parents emotional distress — this at least should be a sine qua non of any cause of action permitting recovery against intentional tortfeasors by parents or close relatives who do not observe the injury producing conduct.
The court, in light of the foregoing discussion, will strike the seventh, eighth and ninth counts of the revised complaint
 IV
In the tenth count, the first twenty-one paragraphs of the first count -are incorporated and it is then claimed that the defendant "recklessly breached her duty to care for and nurture Hannah," paragraph 23, and knew or should have known that this breach would cause the child emotional distress, paragraph 24, and, in fact, the child was caused emotional distress, paragraph 25.
The allegations in this count are different from those in count four alleging negligence or negligent supervision of the child. There, at least in part, actual physical harm or injurious consequences of a physical nature are alleged, although it is also claimed the defendant's conduct caused the child "days of distress and misery." Count four also incorporated the first twenty-one paragraphs of the first count. In the tenth count, simple emotional distress is alleged. Connecticut has long recognized the tort of negligent infliction of emotional distress — a defendant is liable if he or she should have realized that its CT Page 11497 conduct involved an unreasonable risk of causing emotional distress. SeeAncona v. Manafort Bros., Inc., 56 Conn. App. 701, 713 (2000);Connecticut Law of Torts, Wright, Fitzgerald, Ankerman, § 173, p 518 et seq. What is being alleged here is reckless conduct.
The defendant objects to the characterization of the conduct of the defendant as "reckless". For one thing, it notes that the same factual allegations used to support a negligence theory are used to advance the reckless claim. The defendant cites cases such as Sullivan v. Hocon Gas,Inc., Judicial District of Hartford, Docket No. 331786 (1997) (Hartmere, J.), which says: "Where one count of a complaint sounds in negligence and another count attempts to state a cause of action for recklessness by relying on the same fact pattern as the negligence count and simply (refers) to such conduct as reckless, a cause of action for recklessness has not been sufficiently alleged."
But a mere comparison of the factual allegations in a reckless count with those of a negligence claim for identity of language will not solve the problem. In Adams v. Champagne, 22 CLR 214 (1998), this court refused to strike a reckless count where a similar argument was made and said that ""the factual allegations in the negligence count in fact support a claim of reckless conduct. . . . The being the case, there is no reason why the plaintiff, relying on the same set of facts in negligence counts cannot set forth in separate counts causes of action arising out of those same set of facts alleging recklessness, cf. Knapp v. Walker, 73 Conn. 459,461 (1900).
The court must look at the factual allegations to determine whether they set forth a reckless allegation. When they contracted for her services, the defendant told the parents about a "typical day" which included individual attention to the child, naps and video after naps, she spoke of the importance of communication between the parents and herself, paragraphs 5 and 6. On August 27, 1997, when the child was eight weeks old, the parents put her in day care but at some point they became concerned because she cried when being dropped off at day care, at lunch time, and her physical and social development were "no longer in the normal range," paragraph 12. One day the mother observed two state cars at the defendant's, the defendant said she was being investigated but denied any fault, paragraphs 13, 14 and 17. Then, in paragraphs 20 and 21, it simply states the Department of Public Health contacted the plaintiff parents regarding the defendant's care of the child, Hannah, and paragraph 21 "Hannah had been allowed to cry for long periods of time without any intervention by the defendant, and that the defendant failed to provide an atmosphere of warmth, caring and concern for Hannah, paragraph 22. Dubay v. Irish, 207 Conn. 518 (1988) is a leading case in this area and it defines reckless behavior as opposed to negligence. That CT Page 11498 court quoting from earlier cases and Prosser said, among other things, that recklessness is "something more than failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them." Id., p. 532. At page 533, the court goes on to quote from Prosser to say that reckless conduct is "highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent . . . (it is) more than any mere mistake resulting from inexperience, excitement or confusion and more than mere thoughtlessness or inadvertence or simply inattention."
We are a fact pleading state and several allegations here are vague and conclusory, see for example paragraph 22. The only actual factual allegation is that the child was allowed to cry for long periods unattended. That without more cannot qualify as more than mere negligent behavior. There is a broad allegation made without reference to factual support that the child's physical and social development were not in the normal range. But it is not indicated or even alleged that the defendant knew or could have known about this from her three and one-half month contact with the child.
The court will strike the tenth count but it is doing so solely on the basis that reckless activity is being alleged. The plaintiff, of course, has a right to plead over and in any event the court is not ruling on the propriety of a claim of negligent infliction of emotional distress or deciding whether even if such a claim is made that it would not be duplicative of the negligence claim in count four.
For the reasons discussed previously, the court will strike the eleventh and twelfth counts. The court concludes Clohessy v. Bachelor, supra, governs and its requirements of contemporaneous sensory perception have not been met. It is also true that the third Clohessy requirement of death or serious physical injury has not been met. There is no indication that the physical and social development problems were of a permanent or irreversible nature or how far the child's condition departed from the normal. Furthermore, even if the court is incorrect in characterizing the defendant's conduct as not being reckless and if recklessness is appropriately alleged, the court concludes that, given the facts of this case, Clohessy like concerns would warrant striking count ten and eleven — see discussion in section three about parental recovery for injury to child where tortfeasor acted intentionally.
If action by parents will not lie in the case of intentional action it should not apply where tortfeasor acted recklessly.
 V
CT Page 11499
It is difficult to be exactly clear as to the theory of liability asserted in counts thirteen, fourteen and fifteen. In paragraph 22 of each count it is alleged that the defendant has held herself out as a person with special knowledge or skills, the next two paragraphs allege that the defendant intentionally breached her duty to care for and knew that her breach would cause the child injury. A claim under this theory is brought on behalf of the child and on behalf of the parents. The plaintiff, parents, assert that the defendant knew her actions would cause injury to them.
The defendant argues the plaintiff in reality sets forth a claim for "daycare malpractice." Barnes v. Schlein, 192 Conn. 732, 735 (1984) is cited for its language to the effect that "malpractice is commonly defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent, reasonable member of the profession with the result of injury, loss or damage to the recipient of those services." The defendant goes on to argue that the law only recognizes a claim of malpractice for breach of a duty during the delivery of professional services. Unlike attorneys, doctors or accountants, for example, a day care provider does not deliver a professional service.
The plaintiffs, not to be discouraged, accept the characterization of their claim as one for professional malpractice. It is argued that our state should recognize a claim of professional malpractice by a day care provider. The plaintiff points to state regulations, authorized by §19a-87 (b) and the statutory requirements themselves which regulate day care providers. To become a day care provider, references must be submitted which indicate the applicant's interest in and knowledge about children's developmental needs and good judgment about supervision and safety of children, personal competence and emotional stability.
The fact that an occupation is licensed or even closely supervised, however, does not argue for the rationality of creating a cause of action for professional malpractice by day care providers. Doctors, physical therapists, dentists, lawyers and accountants submit themselves to a standardized course of training. Individuals running family day care homes are regulated by § 19a-87b-1 et seq. There is a detailed licensing procedure provided for but very little in the way of formal or standardized educational requirements. Day care providers interact with children in a great variety of ways throughout the day regarding, for example, their napping, eating by way of snacks, play time, type of play, interaction with other children, educational activities, dealing with behavioral problems, physical or emotional illness or problems, CT Page 11500 anxiety and stress caused by separation from parents especially where very young children are involved. The court is not aware of any well-developed body of law concerning the appropriate manner for day care providers to meet their obligations including state regulatory requirements, cf. Nelson v. Ito, 564 N.E.2d 482, 486 (Mich., 1997), quoted in Haynes v. Yale-New Haven Hospital, 243 Conn. 17 (1997). Perhaps more to the point, given the varied nature of the types of interaction day care providers have with children, as even the regulations suggest, it is difficult to conceive of the workability of a standard of care against which a day care provider's conduct may be judged. The foregoing raises concerns similar to the ones recognized. Gutoa v. New BritainGeneral Hospital, 239 Conn. 574, 591 (1996) where the court expressed its doubts about the "viability of the tort of educational malpractice." Id., p. 591.
The suggestion by the plaintiff that failure to recognize this tort theory ignores a public policy that seeks to protect children and flouts regulations meant to protect children misses the point. This court, earlier in this opinion, did not strike a count of ordinary negligence brought against the defendant. The interests the plaintiffs seek to vindicate can be protected in that claim without the need to create a fancy new tort of professional malpractice which really is a claim of professional negligence. The negligence claim can stand and be litigated; the court simply concludes that day care providers are not a part of a profession as understood by analogy to other malpractice claims. The court, therefore, strikes the thirteenth, fourteenth and fifteenth counts.
Even if the court is wrong in its foregoing analysis, it would still feel obliged to strike the fourteenth and fifteenth counts. If professional malpractice by day care providers is a viable tort, the principles of Clohessy v. Bachelor, supra, would apply in the ways previously discussed to preclude a claim by the parents.
 VI
Counts sixteen, seventeen and eighteen appear to assert that there is such a thing as professional malpractice and instead of intentionally breaching the duties required by a proper exercise of that profession as alleged in the previous three counts, the defendant recklessly breached that duty. Having stricken the earlier counts for the reasons stated, the court will now strike the sixteenth, seventeenth and eighteenth counts.
 VII
The eighteenth, nineteenth and twentieth counts are brought by each of CT Page 11501 the plaintiffs, child and parents, under the Connecticut Unfair Trade Practices Act (CUTPA), § 42-110 (a) et seq. of the Connecticut General Statutes.
It is somewhat difficult to ascertain but it appears that the CUTPA claim is based on an allegation that the defendant breached her contractual duty to care for and nurture the child. This claim is apparently intertwined with a claim that all of the plaintiffs received personal injuries because of the negligence of the defendant in allowing the child to cry unattended which also can be construed and in fact is the only factual allegation supporting the breach of contract claim.
The first question to be addressed is whether the activities of a day care center in general fall within the purview of "unfair trade practices" or conduct while engaged in "trade or commerce
CUTPA is an ameliorative act intended, broadly, to protect competitors and consumers from unfair trade practices. It is alleged that the plaintiff parents entered into a contractual relationship with the defendant who held herself out as a day care provider. It is then alleged that the defendant violated the terms of her contractual commitment. There is no real reason to say CUTPA in general does not apply to the activities of day care providers for some reason peculiar to the type of services they deliver. Cases like Haynes v. Yale-New Hospital, 243 Conn. 17
(1997) and Heslin v. Conn. Law Clinic, 190 Conn. 510 (1983) stand for the proposition that only the entrepreneurial or commercial aspects of the medical or legal profession are covered by CUTPA. Haynes ruled the way it did because it did not want every malpractice or negligence claim against a physician to be turned into a CUTPA claim. It relied on the Michigan case of Nelson v. Ito, 564 N.E.2d 482 (Mich., 1997) which held that "it would be improper to view the practice of medicine as interchangeable with other commercial endeavors — if misconduct in the actual performance of medical services were to be covered by unfair trade practice legislation, the well-developed body of law concerning medical malpractice could become obsolete." Id., p. 486. But a day care center delivers a broad variety of services to children ranging from simple care taking and the provision of safe play areas and supervision, educational and developmental activities at various levels, and emergency medical care and health monitoring.
There is no "well-developed body of law" that concerns itself with the day to day operation of day care centers. Thus, there is no policy reason to immunize day care providers from CUTPA coverage, cf. Jane Doe, et alv. lulia Day Nursery, Inc., 23 Conn.L.Rptr. (1998).[2]
Another issue on whether trade or commerce is involved so as to make CT Page 11502 the act operative is whether an isolated act can be the basis for a CUTPA violation. The defendant claims that a single isolated act is alleged as the basis of the CUTPA violation — assuming this characterization of the complaint is correct, can a CUTPA violation be found?
Thus, for example, although there has been a variety of opinions as to whether CUTPA can apply to a single transaction where the participants were not engaged in the business of making such transactions, there are many cases, which this court agrees with, holding that a single transaction falls under the scrutiny of CUTPA where the defendant is a business entity engaged in the business of making such transactions or engaging in the activity which forms the basis of the CUTPA violation;Dadonna v. Liberty Mobile Home Sales, Inc., 209 Conn. 243, 257 (1988);Lambo v. Schlesinger, 15 Conn. App. 150, 153 (1988), cf. McCarthy v.Fingelly, 4 Conn.L.Rptr. 177 (Katz, J.). The defendant cites Mead v.Burns, 199 Conn. 651 (1986) and Quimby v. Kimberly Clark Corp.,28 Conn. App. 660 (1992) for the proposition that a single incident is not sufficient to involve the transaction in trade and commerce and, therefore, subject it to CUTPA scrutiny. This appears to be dealt with by an observation in Connecticut Unfair Trade Practices Act, Langner, Morgan and Belt, Vol. 1 at p. 45, where the authors state: "The issue (of isolated transactions has been discussed in a number of trial court decisions and most have found that a single act is sufficient. Decisions holding a single act not sufficient to violate CUTPA frequently cite Meadv. Burns, a decision holding that proof of a general business practice is necessary to establish a violation of CUTPA based on a violation of the C.G.S. §§ 38-60 and 38-61 (d), now C.G.S. §§ 38a-815 and 38a-816
(6) of the Connecticut Unfair Insurance Practice Act (CUIPA). This result, however, is dependent on the specific language of § 38a-816
(6) of CUIPA and is not applicable to CUTPA claims generally."
Turning to the substantive facts in this case, it is best to analyze this CUTPA claim as based on a breach of contract allegation. The court will rely in part on its earlier discussion of this issue in Designs onStone, Inc. v. John Brennan Construction Inc., 21 Conn. L.Rptr. 659
(1998). It has been held that a simple breach of contract does not offend traditional notions of fairness and thus no violation of CUTPA can be found. The weight of Superior Court decisions supports this position,Chaspek Mfg. Corp. v. Tandet, 1995 WL 447948 (6/16/95); Aussenhandel v.Great Air Mass. Corp., 2 Conn. L.Rptr. 590; Emlee Epuip Leasing Corp. v.Waterbury Transmission, Inc., 41 Conn. Sup. 575 (1991); Troxler Elec Labsv. Pallilla, 1995 WL 299599 (5/10/95); A Secondino Sons, Inc. v. LD Land Co., 1994 WL 161 346, of NLRB v. M M Oldsmobile, Inc., 377 F.2d 712,715 (CA2, 1967) (holding that in context of National Labor Relations Act breach of contract is "not" ipso facto, an unfair labor practice), also see Boulevard Associates v. Soveriegn Hotels, Inc., 72 F.3d 1029, 1039
CT Page 11503 (CA2, 1995) where the court states that a CUTPA claim cannot be made where claim of breach merely sets forth the breach without particularizing how or in what respect defendant's activities are either immoral, unethical, unscrupulous or offensive to public policy, also seeBartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 535 (CA4, 1989) where court construing a North Carolina act similar to our own also concludes that a simple contract claim cannot constitute violation of that state's unfair trade practices act.
The burdens on and risks inherent in contract formation would be intolerably increased and simple breach of contract claims would turn into wind falls in every case.
The reasoning behind this rule is well-stated by Judge Calabresi at72 F.3d at p. 1039, where he says:
 "A rule to the contrary — that a company violates CUTPA whenever it I breaks an unprofitable deal — would convert every contract dispute into a CUTPA violation. We cannot assume that the Connecticut legislature, in enacting CUTPA, intended such an extraordinary alteration of the common law."
But it is also true that "the same facts that establish a beach of contract claim may be sufficient to establish a CUTPA violation." Lesterv. Resort Campgrounds International, Inc., 27 Conn. App. 59, 71 (1992). And the author of Emlee, supra, later held that an allegation of a breach of contract can make a legally sufficient CUTPA claim as long as there are "substantial aggravating circumstances." CNF Constructors, Inc. v.Culligan Water Conditioning Co., 8 CSCR 1057 (1993).
What is the test to determine if the circumstances of the breach are sufficiently aggravating. Judge Calabresi in Boulevard Associates v.Sovereign Hotels, Inc., supra, held as noted, that a CUTPA claim will not lie where simply a breach of contract is I alleged but he suggested that a CUTPA action would be appropriate if the breach is embellished by particularizing how it was immoral, unethical, unscrupulous or offensive to public policy. 72 F.3d at p. 1039. In effect, what he is saying is what Langer, Morgan and Belt say in their work at § 4.3, p. 115 "Subject to the application of more specific rules through legislation, a breach of contract is not a CUTPA violation unless it is found to result in deception or to satisfy the "Cigarette Rule' criteria."
Turning to the facts of this case does the complaint allege that deception or misrepresentation or do its claims otherwise satisfy the CT Page 11504 "Cigarette Rule" so as to make a legally sufficient CUTPA claim?
 (a)
It has been held that a "misrepresentation" can constitute an aggravating circumstance that would allow a simple breach of contract claim to be treated as a CUTPA violation, it would in effect be a deceptive act, cf. CNF Constructor's, Inc. v. Culligan Water ConditioningCo., supra, see dicta in Production Equipment Co. v. Blakeslee v.Arpaia-Chapman, 15 Conn. L.Rptr. 558 (1996). Here the allegation is that as part of her contractual obligations the defendant promised to provide an environment of warmth, caring and concern; it is then alleged in the complaint that the defendant failed to provide this atmosphere and specifically allowed the child to cry for long periods of time without any intervention. Assuming the representation of providing a warm and caring atmosphere includes the assumption of an obligation not to let the child cry unattended, it was a representation made at the time of contract formation claimed not to have been fulfilled at a later time. The court is not aware of a case that holds that a statement predictive of future conduct — here performance under a contract — somehow becomes a "misrepresentation" for CUTPA purposes simply when the party making the representation cannot deliver on the promise. This not to say that to be a misrepresentation the representation must relate to an existing or past fact. Even at common law, there were exceptions to such a requirement such as where the representation as to a future fact was coupled with a present intent not to fulfill the promise, Piava v. Vaneck HeightsConstruction Co., supra, or where there has been non-disclosure of facts by a party having a duty to disclose, Egan v. Hudson Nut Products,142 Conn. 344, 347 (1955). But where these latter factors do not exist, CUTPA liability should not be imposed where the defendant merely has not delivered on a promise (necessarily relating to future performance when made) made at the time the contract was entered into. Otherwise, every simple breach of contract claim would constitute a CUTPA violation since in every breach of contract claim the party who is accused of the breach has not performed on a prior representation (i.e. contract commitment) made at the time of contract formation. Connecticut case law implicitly though not explicitly seems to share this view, thus in CNF Constructors
the representation found to be a misrepresentation "induced the contract," i.e. it must have been a misrepresentation made at time of contract formation to induce party to enter into contract.
There is no allegation here that the defendant knew or should have known or intended to operate her business in such a way as to leave this child crying and unattended when the contract was entered into by the parties. CT Page 11505
Taking the allegations at their most favorable, she simply failed to provide that care and concern she previously promised — this is nothing more than a simple breach of contract claim, cf. UnitedRoasters. et al v. Colgate-Palmolive Co., 649 F.2d 985, 992 (CA4, 1981).
 (b)
Can aggravating circumstances be found here through application of the principles as set forth in the so-called Cigarette Rule adopted by our court in Cheshire Mortgage Services, Inc. v. Montes, 223 Conn. 80, 105
(1992). That rule reads as follows:
 "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether is causes substantial injury to consumers (or competitors or other businessmen)."
The allegations of the complaint must be referred to and in all the counts the plaintiffs rely on two allegations — that the child "had been allowed to cry for long periods of time without any intervention by the defendant," paragraph 21, and ""the defendant failed to provide an atmosphere of warmth, caring and concern" for the child, paragraph 22. The court cannot consider the later allegation since a conclusory statement cannot be used to avoid a motion to strike. Bonamico v. City ofMiddletown, 47 Conn. App. 758, 763-64 (1998); cf. Cavallo v. DerbySavings Bank, 188 Conn. 181, 185 (1982). The court will only consider the factual allegation that the child was left crying for long periods without intervention by the defendant. The paragraphs of the complaint supporting the CUTPA claim do not indicate whether the alleged actions or failures to act regarding the child were negligent or intentional. The rest of the complaint in the various counts appear to take different views on the claimed mental state of the defendant. But even if the allegation was one of negligence that negligence can be read as the causative factor in the breach of contract claim — a not uncommon reason for such breaches.[3] Therefore, the court concludes that the rule in Cheshire Mortgage applies to the effect that in deciding whether unfairness has been established "all three criteria do not need to be satisfied . . . a practice may be unfair because of the degree to which it meets a one of the criteria or because to a lesser extent it meets all three." 223 Conn, at p. 106. CT Page 11506
The court will examine the factual allegations with respect to each of the three criteria of the Cigarette Rule. The same problem runs throughout any such analysis. As noted, no factual allegation in the paragraphs associated with the CUTPA claim allow the court to ascertain whether the defendant's failure to act with regard to the child's crying were negligent or intentional. There is no indication as to how often the child was allowed to cry unattended or, on days when this happened, how long during the day it went on. There are no allegations as to whether the alleged unattentiveness to the crying was accompanied by other examples of lack of attention such as failure to diaper, failure to feed the child or feed her on a regular basis, failure to have nay contact with the child or even sufficient contact, failure to attend to immediate health problems, etc. Although in paragraph 12 the parents said that they noticed inappropriate crying behavior while the child was with them and during the time the defendant had the child in her charge, there is no indication they ever communicated these concerns to the defendant. Paragraph 26 of count eighteen lists various harmful effects on the child due to the defendant's actions or failures to act — subaverage height and weight gain, delays as regards certain developmental criteria. But there is no claim that these maters were known or observable or could have been known or observable Ito the defendant or what they have to do with the crying itself. There is no allegation that the crying was related to some health problem that the defendant was informed about, knew or should have known.
Based on the foregoing, it is difficult to find that criteria 1 of the Cigarette Rule has been met let alone minimally satisfied. State statute and regulations speak in general terms about the duties of a day care provider. Section 19a-87b-10 (h)(2) is headed "full attention" but then merely states the provider shall not engage in any of services to the child. activity that distracts his or her attention from the provisions Subsection (j)(1) says the provider shall not engage in neglectful behavior or restrain the child. But these general admonitions do not provide much insight on whether what is actually alleged here violates the regulation policy. Section 53-21 is our risk of injury statute and seeks to protect the life, limb and health of children but again the allegations made here are too non-specific to permit an observation that concerns under this criminal statute are raised.
As to criteria 2 — immoral, unethical, oppressive or unscrupulous behavior — it is difficult to conclude from what is alleged that this criteria can be said to be even minimally satisfied.
The third criteria gives the court the most concern, however. It must be ascertained whether the practice claimed to be unfair "causes CT Page 11507 substantial injury to consumers." The FTC has defined federal policy regarding the substantial injury requirements. See A-G Foods, Inc. v.Pepperidge Farms, 216 Conn. 200, 215-16 (1990). That policy was expressed in the form of a letter from the chairman and commissioners of the FTC to Senators Ford and Danforth. In that letter, the FTC elaborated on the third prong of "substantial" injury to consumers. The FTC said that in most cases substantial injury involves monetary harm. Although "emotional impact and other more subjective types of harm . . . will not ordinarily make a practice unfair, " the letter of advisement did say that "unwarranted health and safety risks may also support a finding of unfairness." Interestingly, the CUTPA treatise by Langer, Morgan and Belt notes that, in extreme cases where tangible injury can be shown, emotional distress could be considered to support a finding of unfairness — 15 U.S.C. § 1092 is cited (Fair Debt Collection Practices Act) banning, for example, harassing late night phone calls. (See Vol. II, Appendix J, fn. 16, p. 268.)
The 1980 FTC letter goes on to say that any claimed "substantial" injury must not be out weighed "by any offsetting consumer or competitive benefits," Venzina v. Nautilus Pools, Inc., 27 Conn. App. 810, 819
(1992). It is difficult to conceive of the possibility of consumer benefit from permitting day care providers to breach contracts to take care of children in an appropriate manner.
The final factor which raises real concern for the court in cases of this type mentioned in the 1980 FTC letter and the Venzina case is that the injury alleged under this third prong of the "Cigarette Rule" must not be one that the consumer could have avoided. In a situation where parents leave their child in the trust of another so they can work it is difficult to see how the parents could monitor mistreatment to the child. Obviously, a defenseless child of a few months old cannot protect its interests through articulated complaints. As here, the child's various upsets in the parents' presence especially when associated with going to the day care facility can hardly be said to give the parents fair warning that a serious problem was involved. For all of these reasons, the applicable state regulations make provision for unannounced visits by state inspectors.
The court's concerns raised by the considerations sought to be addressed by the third prong, however, will not save a complaint which is basically inadequate in specifying the conduct which is serious and harmful enough to form the basis of a CUTPA claim. In other words, the "practice" referred to throughout the three prongs of the Cigarette Rule and which is the template against which the test of each prong is measured, that practice, in a fact pleading state, must be set forth with sufficient clarity so that from the complaint a court could determine CT Page 11508 that the policy behind the act has been sufficiently called into question.
The court concludes that has not been done here, at least at this point in the litigation, and will strike the eighteenth, nineteenth and twentieth counts.
 VIII
The defendant has moved to strike the twenty-second, twenty-third and twenty-fourth counts. These counts allege misrepresentation on the part of the defendant and are brought by each of the plaintiffs.
The complaint in this regard and others could have benefitted [benefited] from the filing of a request to revise. The basis for the misrepresentation claim lies in paragraphs 8 and 9. The eighth paragraph states that in July, 1997, the child's parents contracted with the defendant to give daily care to the child. Paragraph nine states that "within the writing presented to Hannah's parents by the defendant for their signatures, the defendant contracted to provide her (the child) an atmosphere of warmth, caring and concern." Each of these counts do not even allege this atmosphere was not provided, they just state in paragraph 21 that the child had been allowed to cry for long periods of time without the defendant's intervention. In paragraph 22, it is then stated that "the defendant misrepresented to Hannah's parents the care she would provide for Hannah."
The defendant cites Miller v. Appleby, 183 Conn. 51, 54-55 (1981) which sets forth the essential elements of an action for misrepresentation. She then refers to Section 552 of the Restatement (Second) of Torts which defines neglient misrepresentation cited in William Ford, Inc. v.Hartford Courant Co., 232 Conn. 559, 575 (1995). In support of her motion to strike at pp. 34 and 35 of her brief, the defendant makes the following argument, "Essentially, the plaintiffs fail to allege what statements were made by the defendant. Moreover, the plaintiffs do not adequately allege the defendant made any statements that she knew or should have known were false and would be relied upon by the plaintiffs." The court does not entirely agree with this characterization of the complaint. As noted, the complaint does note the defendant contractually bound herself to provide the child with a warm and caring atmosphere. But despite this, the court believes these counts should be stricken. One of the elements of fraud or misrepresentation is that the representation must be of an existing fact. Thus, it has been held that ; "misrepresentations as to the future (if outside the control of the speaker) are generally not within the scope of legal fraud or deceit."Connecticut Law of Torts, Wright, Fitzgerals and Ankerman, 3d Ed., § CT Page 11509 138, p. 394. Also, see Prosser and Keeton on Torts (5th Ed.) § 109. But it has been true for quite a while in our state that despite this "a promise to do an act in the future when coupled with a present intent not to fulfill it is a false representation." Flaherty v. Schettuno,136 Conn. 222, 226 (1949). However, as noted in Flaherty, "the intention of the promisor not to perform cannot be established by proof of nonperformance only, nor does his (sic) failure to perform an agreement throw upon him (or her) the burden of showing that his (or her) nonperformance was due to reasons which operated after the agreement was entered into." Id., pp. 226-27.
The only factual allegation made to support the misrepresentation count is that after the contract began the child was permitted to cry without intervention with the implied claim that this established lack of a warm and caring atmosphere which had been promised — but this is merely a claim of nonperformance which is encompassed in the breach of contract count. To avoid a conclusory claim on the misrepresentation counts the plaintiff must set forth some factual allegations supporting the notion that at the time the contract was entered into the defendant had no intention of performing under it and made her false representation to induce the contract. Unless this minimum requirement is met every ordinary breach of contract claim can be turned into a misrepresentation claim by use of a turn of phrase in the pleadings — i.e. the defendant misrepresented he or she would perform under the contract when it was entered into and the proof of that is that he or she did not perform. That, at least to the court, will not do; the twenty-second, twenty-third and twenty-fourth counts are stricken.
 IX
The twenty-fifth, twenty-sixth and twenty-seventh counts are again brought by the child and her two parents individually. They each in effect repeat the factual allegations of the first count; the physical and emotional harm allegedly caused to the trial by the actions of the defendant are then set forth in paragraph 25. Paragraph 25 of each of these counts states that "by so injuring Hannah, the defendant violated C.G.S. § 53-21 et seq." The latter statute and the relevant portion for purposes of this case reads as follows: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured, or does any act likely to impair the health or morals of any such child . . ., is guilty of a class C felony."
The case of Antimerella v. Rioux, 229 Conn. 479 (1994) noted that in determining whether a statute prohibiting certain conduct also affords a CT Page 11510 private cause of action the court generally applies the rule of statutory construction that when the legislative has authorized supplementary causes of action it has done so explicitly. Id., p. 495. But right after this observation the court said that in deciding whether a private cause of action can be read into a silent statute . . . "we assess whether the legislature concluded that private interests were amply served without private causes of action." In fact, the case went on to hold that the statutes in question, although they did not explicitly create a private cause of action did in fact entitle the plaintiff in that case "to vindicate his claims through a private cause of action. Id., p. 496.
A section of the Restatement (Second) Torts deals with this issue. Section 874A states:
 When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action.
As the Restatement notes in comment (c) "the typical case falling within this section is one involving a criminal statute that prescribes certain conduct and imposes a criminal penalty but says nothing about civil responsibility." Another Restatement observation in comment (d) should also be kept in mind; there it is said that "courts often continue to speak of legislative intent in this situation, but this should be with the realization that under these circumstances they are using the expression in a figurative, rather than a literal sense. Intent here has a different meaning. It is sometimes thought of as referring to how the legislative body "would have dealt with the concrete situation' if it had the situation before it in the way in which it is now before the court."
Comment (h) to the Restatement section lists factors that should be considered in deciding whether a civil remedy should be attached to a criminal statute. See pp. 308-312.
The first factor to be considered is how specific is the statute in its regulation of conduct — does it let the court and the actor know in advance what conduct is prohibited? Although § 53-21 has been held not to be constitutionally infirm as being I void for vagueness State v.Eason, 192 Conn. 32 (1984), it cannot be said to lay a blueprint for CT Page 11511 proscribed activity.
It is true that one factor suggested by the Restatement as a reason for creating a private remedy certainly exists her — "the significance of the purpose that the legislative body is seeking to effectuate." Nothing can be more important than the welfare of children (see subsection 4 of comment (h)).
Militating strongly against the creation of a private remedy, however, are several factors referred to in subsection 2, 3 and 6 of comment (h).
The adequacy of existing remedies is a consideration. There are a variety of other criminal statutes besides § 53-21 which could be used to punish the same conduct made unlawful in that statute. They include the assault statutes, reckless endangerment, the sex offense statutes, unlawful restraint. Civil tort causes of action can be relied upon by the child and in the appropriate case the parents of the injured child; these would include actions in negligence, intentional assault, and where properly plead and factually supported, negligent and intentional infliction of emotional distress.
The next consideration is whether the creation of the tort action will aid, supplement or interfere with existing remedies and other means of enforcement. In addition to the criminal statutes protecting children previously mentioned the state in Chapter 814d has established a Commission on Children which meets regularly with broad powers to investigate all matters regarding the welfare of children and recommend changes in laws and procedures to protect them. Chapter 815f is entitled "Juvenile Matters" and provides a statutory scheme for protecting children from abusive parents and guardians. As regards the specific problems presented by family day care homes, the Commissioner of the Department of Public Health has promulgated v detailed regulations concerning licensing and provision of services by the day care provider. Significantly, the regulations provide for the provider to consent to home visits by department representatives, § 19a-87b-5 (i), and then set out in some detail provisions for "department access, inspection and investigation during home visits." See § 19a-87b-13. Unannounced spot inspections are also provided for. See subsection (e). ln fact, in this case one of the factors noted in the complaint that alerted the parents to the fact that their might be a problem was the presence of two state vehicles on the defendant's premises when the mother went to pick up the child. There is no allegation here that the appropriate administrative agencies are unwilling or unable to do their job. All of these factors argue against the need for creating a private remedy under § 53-21.
Also a very strong factor referred to by the Restatement against CT Page 11512 allowing a private cause of action is mentioned in subsection 6 to comment 9h): "The burden that the new cause of action will place on the judicial machinery. Will a heavy flow of litigation result?" Given the very broad language of § 53-21 ("vague" is no longer appropriate after State v. Eason, supra), the courts would be deluged by the amorphous cause of action that would be permitted as a civil adjunct to § 53-21. In. light of the civil tort actions already in existence to protect children and their parents there is no need to create this new cause of action.
The twenty-fifth, twenty-sixth and twenty-seventh counts are stricken.
In light of the courts previous rulings, there is no basis in the prayer for relief to claim treble damages; punitive damages and attorney's fees. Those requests for relief are stricken. The court also strikes all counts except the first, second, third and fourth counts.
Corradino, J.